UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| MARY SWEENEY, | ) | NO. CV 03-8930-MAN |
| | ) | |
| Plaintiff, | ) | |
| | ) | MEMORANDUM OPINION |
| v. | ) | |
| | ) | AND ORDER |
| JO ANNE B. BARNHART, | ) | |
| Commissioner of the | ) | |
| Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| ———————————————— | ) | |

Plaintiff filed a Complaint on December 9, 2003, seeking review of the denial by the Social Security Commissioner ("Commissioner") of Plaintiff's claim for disability insurance benefits ("DIB"). On February 5, 2004, the parties filed a "Consent to Proceed Before a United States Magistrate Judge" pursuant to 28 U.S.C. § 636(c). The parties filed a Joint Stipulation on October 26, 2004, in which: Plaintiff seeks an order reversing the Commissioner's decision denying benefits and remanding for the payment of benefits or, alternatively, for further administrative proceedings; and Defendant requests that the Commissioner's decision be affirmed. The Court has taken the parties' Joint Stipulation under submission without oral argument.

## SUMMARY OF ADMINISTRATIVE PROCEEDINGS

Plaintiff filed an application for DIB on April 6, 1999. (Administrative Record ("A.R.") 155-57.) Plaintiff claims to have been disabled since August 10, 1995, due to osteoarthritis in her neck and lower back and related pain and symptoms, abdominal pain, diverticulitis, depression, anxiety, panic attacks, insomnia, and fatigue. (A.R. 20, 155.) She has past relevant work experience as an administrative analyst, secretary, and office manager. (A.R. 21.)

The Commissioner denied Plaintiff's claim for benefits initially and upon reconsideration. On October 11, 2000, Plaintiff, who was represented by counsel, appeared and testified at a hearing before Administrative Law Judge David Agatstein ("ALJ"). (A.R. 30-100.) On November 22, 2000, the ALJ denied Plaintiff's request for benefits, and the Appeals Council subsequently denied Plaintiff's request for review of the ALJ's decision. (A.R. 20-29, 8-11.)

## BACKGROUND AND SUMMARY OF ADMINISTRATIVE DECISION

**A.   Plaintiff's Medical Evidence**

In support of Plaintiff's claimed physical impairments, there are records from her treating physician, Dr. Robert Watkins, an orthopedic surgeon at the Center for Orthopaedic Spinal Surgery, as well as other health care professionals at that hospital, for the period from April 1997, to January 2003. (A.R. 248-73, 512, 532-35, 556-59.) In a report dated April 23, 1997, Dr. Watkins diagnosed Plaintiff with disc disorder

2

and herniated nucleus pulposus; found that Plaintiff's symptoms began "acutely" one to two years prior and had become worse; and noted Plaintiff's statements that her pain prevented her from walking more than one mile, sitting more than a half hour, and standing more than ten minutes.  (A.R. 258-65.)  On November 11, 1998, Dr. Watkins noted that Plaintiff was experiencing increased neck symptoms and pain, including pain radiating down her right anterior thigh that she did not have before, and she was not making progress in her physical therapy.  (A.R. 253.)  On February 23, 2000, Dr. Watkins noted that Plaintiff's back and neck problems became worse due to her ruptured appendix, and she "is totally medically disabled because of continued severe back problems." Specifically, he noted that Plaintiff "has a great deal of difficulty lifting over 10 pounds" and "has a 15 minute tolerance with sitting, walking and standing and has had a great deal of difficulty with sitting pain while she drives."  (A.R. 533.)  On January 6, 2003, Dr. Watkins diagnosed Plaintiff with cervical degenerative disc disease, at the C5-6 and C6-7 levels, and lumbar degenerative disc disease, at the L4-5 level, and further stated that "[i]f her symptoms continue and she gets no improvement nonoperatively, we recommend a one-level lumbar fusion and a two-level cervical fusion."  (A.R. 558.)

On August 27, 1996, Dr. Fred Hafezi, an orthopedic surgeon to whom Dr. Watkins referred Plaintiff, provided a "clinical diagnosis"[1] of right-sided cervical chronic myoligamentous sprain and strain with entrapment of the right C4 and C5 nerve roots and a "differential

_____

    [1]   A "clinical diagnosis" is defined as "a diagnosis made from a study of the signs and symptoms of a disease."  STEDMAN'S MEDICAL DICTIONARY (27th ed. 2000) ("STEDMAN'S").

diagnosis"[2] of right-sided cervical arthropathy and right suprascapular traction injury, and recommended use of a rigid back brace, ongoing chiropractic soft tissue manipulation and physical therapy to her neck and low back, and epidural steroid injections. (A.R. 213-18.) He found that Plaintiff's low back condition resulted from her October 27, 1995 injury, and her neck and right shoulder injuries resulted from her August 10, 1995 injury. (A.R. 218.) He noted that "her current disability [limits] her to light household chores and [requires] avoidance of any contact, sudden impact or running sports." (*Id.*) Dr. Hafezi also performed a Definitive Diagnostic Thermography and concluded that this test showed that Plaintiff suffered from left iliolumbar ligament strain, thoracolumbar ligamentous strain, and L4-5 inflammatory discopathy.[3] (A.R. 219.)

Records from Dr. Charles Davis, Plaintiff's treating chiropractor, for the period from December 1995, to September 1999, are also included in the record. (A.R. 367-83, 415-69.) On July 22, 1996, Dr. Davis diagnosed Plaintiff with left sacroiliace dysfunction, lumbar sprain with myofascial pain, cervical segmental dysfunction, and vertebral subluxation complex, and opined that her condition had "reached a point of maximum medical improvement." (A.R. 379-83.) On April 26, 1999, Dr. Davis noted that Plaintiff's "ability to work will be limited to part

---

[2]    A "Differential diagnosis" is defined as "the determination of which of two or more diseases with similar symptoms is the one from which the patient is suffering, by a systematic comparison and contrasting of the clinical findings." STEDMAN'S.

[3]    Thermography is a noninvasive diagnostic technique that allows the examiner to visualize and quantify changes in skin surface temperature, which is used as a tool in diagnosing neuromsculoskeletal injuries.

time, sedentary conditions, in which she would be able to [take] breaks at her leisure."  (A.R. 373.)

There are records from Yonemoto Physical Therapy Services for the period from January 1998, to August 2000 (A.R. 244-47, 470-511, 517-31) and from Professional Orthopedic and Sports Care for the period from August 1995, to May 1998 (A.R. 221-38, 395-414) regarding Plaintiff's physical therapy for her lumbar and neck pain.

There is an August 14, 1999 Physical Residual Functional Capacity Assessment completed by a state agency physician, whose identity is unclear, which limits Plaintiff to "medium" work, with further exertional and non-exertional limitations.[4]  (A.R. 359-65.)

With respect to her claimed mental impairment, there are records from Dr. Bobbi Carlson, a psychologist, for the period from October 1998, to September 2000.  (A.R. 536-49.)  In a December 2, 1999 Mental Disorder Questionnaire Form, Dr. Carlson noted that Plaintiff:  was "[d]epressed, anxious and easily overwhelmed"; had "[f]eelings of helplessness, hopelessness, anger and frustration"; had "[p]oor sleep" and "[d]ifficulty focusing and concentrating"; had a "blunted" affect, "depressed" mood, "decreased motivation," "[a]nhedonia," and a "moderately high" anxiety level with period panic attacks; and was "[f]requently in too much physical and emotional pain to do errands and needs assistance with housework" and "[u]nable to work."  (A.R. 545-47.)

_____

[4]     "Medium work" involves "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds."  20 C.F.R. §§ 416.967(c); 404.1567(c).

5

Dr. Carlson further explained in this form that: "[Plaintiff] is able to follow simple written or oral instructions but has difficulty when they become more complex"; "[her] ability to focus and concentrate has significantly decreased"; and she has "a great deal of difficulty organizing paperwork and becomes very stressed out when she tries." (A.R. 548.)  She concluded that Plaintiff's "[p]sychiatric prognosis is fair to good with continued treatment," but that "[s]ignificant changes are not likely to occur for at least a year."  (A.R. 549.)

In addition, there is a Psychiatric Review Technique form completed by Dr. D.F. Rendinell, a state agency psychiatrist, who found that there was "insufficient medical evidence" to make a determination regarding whether Plaintiff had a medically determinable mental impairment.  (A.R. 384-85.)

**B.    The ALJ's Decision**

At the October 11, 2000 hearing, the ALJ elicited testimony from Plaintiff and from her friend, Linda Sansom, regarding Plaintiff's claimed impairments.  The ALJ also elicited testimony from Dr. Paul Harvey, a non-examining medical expert, and from Martin Brodwin, a vocational expert.  (A.R. 30-100.)

In his November 22, 2000 written decision, the ALJ found that Plaintiff has not engaged in substantial gainful activity since her alleged onset date, and was insured for benefits through September 30, 1998.  (A.R. 28.)  The ALJ further found that, through her last insured date, Plaintiff had "severe" physical impairments, consisting of mild

osteoarthritis at the C2-3 facet, minimal narrowing of the L4-5 interspace, and conjoined left L5-S1 nerve root, but that Plaintiff did not have an impairment or combination of impairments listed in, or medically equivalent to an impairment listed in, Appendix 1, Subpart P, Regulation No. 4. (*Id.*) The ALJ found that Plaintiff had "no medically determinable mental impairment" through her last insured date. (A.R. 22.)

The ALJ further found that Plaintiff's allegations regarding her limitations were not credible. (A.R. 28.) With respect to Plaintiff's residual functional capacity during the relevant period, the ALJ found that:

> From August 10, 1995 through September 30, 1998, [Plaintiff] remained able to lift and/or carry fifty pounds occasionally and twenty-five pounds frequently; she could stand, walk and sit for about six hours in an eight-hour workday. With respect to non-exertional limitations, she could only occasionally climb, balance, stoop, kneel, crouch, and crawl.

(*Id.*) Given that residual functional capacity, the ALJ found that Plaintiff could perform her past relevant work as an office manager, secretary, and administrative analyst. (*Id.*) Accordingly, the ALJ concluded that Plaintiff was not disabled within the meaning of the Social Security Act. (A.R. 29.)

///

///

///

7

**STANDARD OF REVIEW**

This Court reviews the Commissioner's decision to determine whether it is free from legal error and supported by substantial evidence. <u>Smolen v. Chater</u>, 80 F.3d 1273, 1279 (9th Cir. 1996). The Commissioner's decision must stand if it is supported by substantial evidence and applies the appropriate legal standards. <u>Saelee v. Chater</u>, 94 F.3d 520, 521 (9th Cir. 1996). Substantial evidence is "more than a mere scintilla but less than a preponderance -- it is such relevant evidence that a reasonable mind might accept as adequate to support the conclusion." <u>Moncada v. Chater</u>, 60 F.3d 521, 523 (9th Cir. 1995).

Although this Court cannot substitute its discretion for that of the Commissioner, this Court nonetheless must review the record as a whole, "weighing both the evidence that supports and the evidence that detracts from the [Commissioner's] conclusion." <u>Desrosiers v. Secretary of Health and Human Serv.</u>, 846 F.2d 573, 576 (9th Cir. 1988); *see also* <u>Jones v. Heckler</u>, 760 F.2d 993, 995 (9th Cir. 1985). "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities." <u>Andrews v. Shalala</u>, 53 F.3d 1035, 1039-40 (9th Cir. 1995). This Court must uphold the Commissioner's decision if it is supported by substantial evidence and free from legal error, even when the record reasonably supports more than one rational interpretation of the evidence. *Id*. at 1041; *see also* <u>Morgan v. Commissioner of the Social Security Administration</u>, 169 F.3d 595, 599 (9th Cir. 1999); <u>Flaten v. Secretary</u>, 44 F.3d 1453, 1457 (9th Cir. 1995).

8

**DISCUSSION**

Plaintiff alleges three general issues.  <u>First</u>, Plaintiff contends that the ALJ failed to properly evaluate her credibility, as well as the credibility of Ms. Sansom, a lay witness, in evaluating Plaintiff's claimed pain and symptoms.  <u>Second</u>, Plaintiff contends that the ALJ erred in finding that she could perform her past relevant work.  <u>Third</u>, Plaintiff contends that the ALJ failed to accord proper weight to the opinions of her treating physicians.  (Joint Stip. at 10-11.)

**A.  <u>The ALJ Improperly Rejected The Opinions Of Plaintiff's Treating Physicians</u>.**

Ordinarily, the opinions of a treating physician should be given great, if not controlling, weight.  *See* Social Security Ruling 96-2p. When the ALJ rejects the opinion of a treating physician, even if it is contradicted, the ALJ may reject that opinion only by providing specific and legitimate reasons for doing so, supported by substantial evidence in the record.  <u>Lester v. Chater</u>, 81 F.3d 821, 830 (9th Cir. 1995); *see also* <u>Reddick v. Chater</u>, 157 F.3d 715, 725 (9th Cir. 1998)(ALJ erred by rejecting the treating physicians' opinions and relying upon Social Security examiners' opinions in finding that claimant's chronic fatigue syndrome had not rendered her disabled).  Broad and vague reasons will not suffice for rejecting the treating physician's opinion.  <u>McAllister v. Sullivan</u>, 888 F.2d 599, 602 (9th Cir. 1989).

///

///

///

9

1. **The Record Should Be Developed Regarding Plaintiff's Physical Limitations Prior To Her Last Insured Date.**

In discussing the treatment records submitted by Dr. Watkins, the ALJ stated:

Robert G. Watkins, M.D., examined [Plaintiff] on April 23, 1997. At that time, [Plaintiff] complained [of] back and leg pain (Exhibit 7F, p. 26). Dr. Watkins diagnosed cervical disc disorder and lumbar herniated nucleus pulposus (Exhibit 7F, p. 13). [Plaintiff] continued to see Dr. Watkins for several "follow-up" visits. On May 17, 1997, Dr. Watkins stated that [Plaintiff] reported considerable improvement (Exhibit 7F, p. 11). Other reports also state that [Plaintiff's] condition continued to improve with physical therapy (Exhibit 7F, pp.7-8). However, on December 9, 1997, Dr. Watkins stated that [Plaintiff] "has an unusual lumbar and leg pain syndrome." He opined that [Plaintiff], having had seventy-two physical therapy visits, should be on a home program (Exhibit 7F, p.9). On August 18, 1998, Dr. Watkins reported that [Plaintiff] was "being helped" by physical therapy [and] she was "expected to continue to improve" (Exhibit 7F, p. 7). Once again, Dr. Watkins opined that [Plaintiff] should "cut down" the physical therapy treatment and begin a home program (id.). [Plaintiff] continued to receive physical therapy, first from Professional Orthopedic and Sports Care, and later from Yonemoto Physical Therapy Services, at least through August 2000 (Exhibit 2F; Exhibit 6F; Exhibit 15F; Exhibit 19F; and Exhibit 22F). On

10

November 11, 1998, [Plaintiff] returned to Dr. Watkins' office for a follow-up examination.   The Administrative Law Judge notes that, according to [Plaintiff], her most recent motor vehicle accident was on September 12, 1998.   She did not, however, seek treatment from Dr. Watkins until November 11, 1998, almost two months later.   At this examination, [Plaintiff] complained of increasing neck pain and pain radiating down her right thigh.   Dr. Watkins recommended [Plaintiff] undergo a bone scan, continue physical therapy, take oral medication, and return for follow-up (Exhibit 7F, p. 12).   On November 17, 1998, the Administrative Law Judge concludes that the condition, most likely, existed on September 30, 1998, when [Plaintiff] was last insured for Title II benefits.   Dr. Watkins did not, on or about the time that [Plaintiff] was last insured for Title II benefits, give any opinion as to [Plaintiff's] ability to perform basic work activities.   In a report dated February 23, 2000, over one year after [Plaintiff] was last insured for Title II benefits, Dr. Watkins opined that [Plaintiff] has difficulty lifting in excess of ten pounds and that she can only sit, walk, and stand for fifteen minutes at a time.   Dr. Watkins remarked that the limitations are a result of the September 1998 automobile accident (Exhibit 20F).   It is interesting to note here that Dr. Watkins is an orthopedic surgeon.   And, while he has and continues to recommend physical therapy for [Plaintiff] with, presumably, little to no improvement after several years, he has not recommended surgery as an alternative method of treatment.

11

1  (A.R. 24-25.)

2

3      The ALJ rejected Dr. Watkins's February 23, 2000 opinion regarding
4  Plaintiff's physical limitations and instead adopted the August 14, 1999
5  residual functional capacity assessment of the state agency medical
6  consultant.   The ALJ reasoned that "[t]he [s]tate [a]gency
7  consultant['s] opinions are based on the objective findings, and
8  [he/she] specifically described the work-related activities [Plaintiff]
9  could perform."  (A.R. 26.)

10

11     Plaintiff contends that the ALJ failed to accord proper weight to
12  Dr. Watkins's February 23, 2000 opinion.   (Joint Stip. at 24.)
13  Plaintiff further contends that, to the extent that the ALJ needed
14  clarification of Dr. Watkins's opinion, he should have developed the
15  record by requesting Dr. Watkins to provide a more detailed rationale
16  for his opinion.  (Joint Stip. at 25.)

17

18     The ALJ's reliance on the August 14, 1999 residual functional
19  capacity assessment completed by a state agency physician, whose
20  identity is unclear, is not a sufficient evidentiary basis for his
21  finding regarding Plaintiff's physical residual functional capacity.
22  See Crane v. Shalala, 76 F.3d 251, 253 (9th Cir. 1996)(ALJ properly
23  rejected doctors' psychological evaluations, because they were contained
24  in check-off forms and lacked any explanation of their bases).

25

26     However, although Dr. Watkins's records provide some guidance, they
27  do not precisely describe Plaintiff's physical limitations prior to
28  September 30, 1998, her last insured date.   In his April 23, 1997

12

report, Dr. Watkins set forth Plaintiff's own descriptions of her limitations, *viz.*, that her pain prevented her from walking more than one mile, sitting more than a half hour, and standing more than ten minutes. (A.R. 264.) In his February 23, 2000 report, Dr. Watkins found that Plaintiff had extreme physical limitations and explained that "[t]he September 1998 accident severely exacerbated her preexisting symptoms, and she has had a difficult time since then." (A.R. 512.) Given the evidence of improvement prior to Plaintiff's September 30, 1998 last insured date[5] and the possibility that her September 1998 accident did not cause a worsening of her symptoms until after her last insured date, it is unclear what limitations Dr. Watkins would have found for the period from Plaintiff's alleged onset date through her last insured date.[6]

     Thus, due to the ambiguity in Dr. Watkins's records and the lack of any other clear evidence in the record regarding the extent of Plaintiff's physical limitations prior to her last insured date, the ALJ must request that Dr. Watkins clarify his findings as to Plaintiff's physical residual functional capacity for the period from her alleged onset date through her last insured date. Brown v. Heckler, 713 F.2d

_____

     [5]   Evidence regarding Plaintiff's improvement prior to her last insured date is further detailed, *infra*, in Section B(1).

     [6]   To the extent Plaintiff contends that the ALJ erred by rejecting Dr. Watkins's opinion that she was "totally medically disabled" (Joint Stip. at 24, citing 533), Plaintiff's argument is unavailing. *See* 20 C.F.R. §§ 404.1527(d)(6)(e)(1) and 416.927(d)(6)(e)(1)("We [the Social Security Commissioner and her designees] are responsible for making the determination or decision about whether you meet the statutory definition of disability"); Nyman v. Heckler, 779 F.2d 528, 531 (9th Cir. 1985)("Conclusory opinions by medical experts regarding the ultimate question of disability are not binding on the ALJ.").

13

441, 442-43 (9th Cir. 1993)(The Commissioner has an affirmative duty to develop the record, even if the claimant is represented by counsel); 20 C.F.R. §§ 404.1512(e), 416.912(e) (duty to re-contact treating physician). *See also* <u>Thomas v. Barnhart</u>, 278 F.3d 947, 956-57, 959 (9th Cir. 2002)(The requirement in 20 C.F.R. § 416.912(e) that the Commissioner re-contact treating sources is triggered only where the information from the treating sources is inadequate to make a determination regarding disability).   While such findings from Dr. Watkins will be retrospective in nature, they are necessary here, and it is critical to determine, to the extent possible, whether Plaintiff's September 1998 accident undermined any prior improvements in her medical condition.   *See* <u>Flaten</u>, 44 F.3d at 1461 (claimant may establish a continuous disabling impairment with a retrospective diagnosis); *see also* <u>Estok v. Apfel</u>, 152 F.3d 636, 638-39, 641 (7th Cir. 1998)(retrospective diagnosis of fibromyalgia may be considered if it is corroborated by evidence contemporaneous with the claimed period of disability, but not where the physician offers no opinion regarding the level of severity and disability that it created in the past).

Finally, with respect to Plaintiff's contention that the ALJ failed to consider the impact of her diverticulitis adequately (Joint Stip. at 31), the record shows that Plaintiff was diagnosed with diverticulitis shortly after her last insured date, in May 1999.  (A.R. 291 -- May 6, 1999 progress notes diagnosing Plaintiff with diverticulitis; A.R. 298 -- May 9, 1999 laboratory report diagnosing Plaintiff with diverticulitis; A.R. 288-95 -- progress notes indicating Plaintiff was hospitalized for diverticulitis, which caused fever, pain, and vomiting, from May 6, 1999, to May 12, 1999.)  While it is unclear, it is possible

that Plaintiff may have suffered from some limitations from her diverticulitis on or before her September 30, 1998 last insured date. (*See also, e.g.*, A.R. 81 -- testimony of Dr. Harvey, the non-examining medical expert, that Plaintiff "may have [had] some diverticulitis or diverticulosis with intermittent diverticulitis" prior to her last insured date.") Because the case is being remanded so that the ALJ can request further clarification from Dr. Watkins regarding Plaintiff's limitations flowing from her lumbar condition during the relevant time period, the ALJ should similarly seek clarification from Plaintiff's treating physicians at Huntington Hospital, the hospital at which she received treatment for her diverticulitis, as to what limitations, if any, may have been caused by Plaintiff's diverticulitis prior to her last insured date.   Any such limitations should be considered in combination with Plaintiff's other impairments in determining whether she was disabled for the claimed period of disability. *See* 20 C.F.R. §§ 404.1520(d), 416.920(d); Lewis v. Apfel, 236 F.3d 503, 514 (9th Cir. 2001).


**2.   The Record Needs To Be Developed Regarding Whether Plaintiff Had A "Severe" Mental Impairment Prior To Her Last Insured Date.**


"An impairment or combination of impairments can be found 'not severe' only if the evidence establishes a slight abnormality that has 'no more than a minimal effect on [a claimant's] ability to work.'" Smolen, 80 F.3d at 1290 (citing Social Security Ruling 85-28; Yuckert v. Bowen, 841 F.2d 303 (9th Cir. 1988)); 20 C.F.R. § 416.921 ("[a]n impairment or combination of impairments is not severe if it does not

significantly limit your physical or mental ability to do basic work activities."); *see also* <u>Bustamante v. Massanari</u>, 262 F.3d 949, 955-56 (9th Cir. 2001)(ALJ's finding that claimant's mental impairment was not severe was not supported by substantial evidence because every mental health professional who examined claimant found significant mental problems).  The "severity" requirement is merely "a *de minimis* screening device to dispose of groundless claims." <u>Edlund v. Massanari</u>, 253 F.3d 1152, 1158 (9th Cir. 2001)(citing <u>Smolen</u>, 80 F.3d at 1290).  "[A] claim may be denied at step two only if . . . a finding [that the relevant impairments are not medically severe] is *clearly established by medical evidence*."  Social Security Ruling 85-28 (emphasis added).

With respect to Plaintiff's claimed mental impairment, the ALJ stated:

When [Plaintiff] requested reconsideration on July 28, 1999, she also alleged disability due to poor concentration, memory problems, depression, and anxiety attacks (Exhibit 4E, pp.1, 5, 8).  While [Plaintiff] listed eight treatment sources on her Reconsideration Disability Report, she failed to list a mental health specialist (Exhibit 4E, pp. 2 and 4). [Plaintiff] also alleged that, since the accident of October 25, 1995, she has been physically and mentally disabled (Exhibit 4E, p.8).  A review of the medical evidence of record, however, discloses that [Plaintiff] did not seek mental health treatment until October 8, 1998 [after her last insured date].  Mental health progress notes disclose that [Plaintiff] was "referred by her sister" (Exhibit 24F, p.9).

16

Prior to the date she was last insured for Title II benefits, or at anytime thereafter, [Plaintiff's] treating physicians did not recommend she seek mental health treatment, and, she has not been prescribed anti-depressant or any other type of therapeutic mental health medication.  Additionally, a mental disorder questionnaire, completed by Bobbi Carlson, Ph.D., [Plaintiff's] current treating psychologist, confirms that [Plaintiff] did not begin mental health treatment until October 8, 1998, after the expiration of her insured status. *Consequently, the Administrative Law Judge finds that, during the period in question, [Plaintiff] had no medically determinable mental impairment.*

(A.R. 22; emphasis added.)

Plaintiff contends that the ALJ improperly evaluated her claimed mental impairment.  Specifically, Plaintiff contends that the ALJ improperly rejected the mental impairment and related limitations found by Dr. Carlson, her treating psychologist.  (Joint Stip. at 23-24.)

The ALJ's finding that Plaintiff had no "severe" mental impairment prior to her September 30, 1998 last insured date is not based on substantial evidence.  It is true that Plaintiff did not seek treatment for her depression with Dr. Carlson until October 1998, the month following the expiration of her last insured date, as the ALJ correctly recognized.  Nevertheless, the close proximity in time between her last insured date and date she began seeking mental health treatment suggests that her depression may have existed prior to her last insured date and

17

may have had more than a minimal impact on her ability to work.  Indeed, Dr. Carlson's first progress records dated October 8, 1998 -- only eight days following her last insured date -- note significant depression and related symptoms.  (A.R. 544 -- October 8, 1998 progress notes stating: "[a]ffect flat to tearful"; "[m]ood severely depressed"; "feelings of helplessness, hopelessness, anger and frustration"; "self-esteem very low.")

Certainly, the December 2, 1999 uncontradicted opinion of Dr. Carlson only addressed Plaintiff's mental limitations as of that date. However, although all of Plaintiff's mental limitations set forth in Dr. Carlson's December 2, 1999 form may not have been present prior to her last insured date, the severity of the limitations noted in that form suggest that Plaintiff may have had more than *de minimis* mental limitations prior to her last insured date.  Aside from Dr. Carlson's records, there is a November 23, 1999 Psychiatric Review Technique form completed by Dr. Rendinell, which merely notes that there is "insufficient medical evidence" to determine whether Plaintiff has a medically determinable mental impairment.  (A.R. 384-85.)

Due to the ambiguity regarding the extent of Plaintiff's mental impairment prior to her last insured date, the minimal threshold for a finding of "severity," the treatment records from Dr. Carlson only shortly after Plaintiff's last insured date, and Dr. Carlson's December 2, 1999 opinion noting significant mental limitations and symptoms, the ALJ should develop the record by seeking clarification from Dr. Carlson as to when Plaintiff's depression began and the effects, if any, her depression had on her residual functional capacity following Plaintiff's

alleged onset date and prior to her last insured date. Like the retrospective diagnoses required from Plaintiff's treating physician regarding her physical impairments noted above, this retrospective diagnosis is necessary in order to determine the severity of Plaintiff's mental impairment and her mental residual functional capacity prior to her last insured date. *See* Flaten, 44 F.3d at 1461; Estok, 152 F.3d at 638-39, 641.

Accordingly, the ALJ should seek further clarification and diagnoses from Plaintiff's treating doctors regarding her claimed physical and mental impairments.

**B.   The ALJ Provided Proper Grounds For Rejecting Plaintiff's Credibility, But Substantial Evidence Does Not Support His Rejection Of The Testimony Provided By Plaintiff's Friend.**

   **1.   The ALJ's Rejection Of Plaintiff's Credibility**

The law is well-settled that, once a disability claimant produces objective medical evidence of an underlying impairment that could reasonably be expected to cause some level of pain of the type which the claimant alleges, the claimant's subjective complaints regarding the severity of his or her pain may not be discredited based solely on a lack of objective medical evidence to corroborate the allegations. Tonapetyan v. Halter, 242 F.3d 1144, 1147-48 (9th Cir. 2001); Bunnell v. Sullivan, 947 F.2d 341, 345 (9th Cir. 1991); Fair v. Bowen, 885 F.2d 597, 601 (9th Cir. 1985). As the Ninth Circuit has explained:

[A]n ALJ's finding that a claimant generally lacked
credibility is a permissible basis to reject excess pain
testimony.  But, because a claimant need not present clinical
or diagnostic evidence to support the severity of his pain,
*Gonzalez v. Sullivan*, 914 F.2d 1197, 1201 (9th Cir. 1990)
(stating that "it is the very nature of excess pain to be out
of proportion to the medical evidence"), a finding that the
claimant lacks credibility cannot be premised wholly on a lack
of medical support for the severity of his pain.

Light v. Social Security Admin., 119 F.3d 789, 792 (9th Cir. 1997).
This rule is based on the recognition that pain is an inherently
subjective phenomenon, which cannot be objectively verified or measured
and varies significantly among individuals.  Bunnell, 947 F.2d at 347.

Unless the evidence suggests affirmatively that a claimant is
malingering, the ALJ must provide clear and convincing reasons for
rejecting the claimant's excess pain or symptom testimony, such as
conflicts between the claimant's testimony and conduct, or internal
contradictions in the claimant's testimony.  Dodrill v. Shalala, 12 F.3d
915, 918 (9th Cir. 1993); Light, 119 F.3d at 792.  In determining
whether a claimant's testimony regarding the severity of his symptoms is
credible, the ALJ may consider:  "(1) ordinary techniques of credibility
evaluation, such as the claimant's reputation for lying, prior
inconsistent statements concerning the symptoms, and other testimony by
the claimant that appears less than candid; (2) unexplained or
inadequately explained failure to seek treatment or to follow a
prescribed course of treatment;  and (3) the claimant's daily

20

activities." <u>Smolen</u>, 80 F.3d at 1284.

The Court will give great weight to the ALJ's credibility assessment. <u>Anderson v. Sullivan</u>, 914 F.2d 1121, 1124 (9th Cir. 1990); <u>Brawner v. Secretary</u>, 839 F.2d 432, 433 (9th Cir. 1988)(recognizing that the ALJ's credibility determination is to be given great weight when supported specifically). However, when an ALJ's decision rests on a negative credibility evaluation, "the ALJ must make findings on the record and must support those findings by pointing to substantial evidence on the record." <u>Cequerra v. Secretary</u>, 933 F.2d 735, 738 (9th Cir. 1991); <u>Orteza v. Shalala</u>, 50 F.3d 748, 750 (9th Cir. 1995)(the ALJ's findings must be "sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony.") When discrediting a claimant's testimony, it is not enough for the ALJ to make only general findings; he must state which pain or symptom testimony is not credible and what evidence suggests that the complaints are not credible. *See* <u>Swenson v. Sullivan</u>, 876 F.2d 683, 688 (9th Cir. 1979).

In rejecting the credibility of the claimed pain and limitations described by Plaintiff, the ALJ explained, in pertinent part:

> At the hearing, [Plaintiff's] testimony, for the most part, reflected her current medical condition. When the Administrative Law Judge questioned [Plaintiff] regarding her condition in September 1998, [Plaintiff] testified that her condition "was better." [Plaintiff] also testified that, at that time, she was able to walk six laps and she "felt good."

21

After she was questioned by her representative, however, [Plaintiff] testified that, prior to her accident in September 1998, she "still had problems, but she was getting better."

. . . .

[Plaintiff] has made inconsistent statements regarding her impairments and the effect that they have on her ability to function.  At the hearing, [Plaintiff] testified that she has been disabled since August 10, 1995.  Upon further questioning by the Administrative Law Judge, [Plaintiff] testified that she was feeling better by September 1998. However, in a medical report dated April 15, 1998, [Plaintiff] reported that her neck and back pain "act up from time to time" (Exhibit 10F, p. 28.)  This statement indicates [Plaintiff] was experiencing a lesser degree of limitation than she described at least five months prior to the expiration of her insured status.  Additionally, physical therapy notes from Yonemoto Physical Therapy Services, dated subsequent to [Plaintiff's] most recent accident yet prior to the expiration of her date last insured, reveal improvement. On September 21, 1998, [Plaintiff] tolerated a mild increase in her exercises and was "o.k. - better" (Exhibit 19F, p. 27). On September 25, 1998, [Plaintiff] was reported to be "encouraged - doing better," and on September 29, 1998, her major complaint was that she was still having difficulty sleeping (id.).  Progress notes for the remainder of 1998, for the most part, indicate that [Plaintiff] was "o.k.," "not

22

bad," or "getting better" (Exhibit 19F, pp. 20-25). By December 14, 1998, [Plaintiff] was able to walk four laps around the track for a total walking distance of one mile (Exhibit 19F, p. 22). [Plaintiff] was reported to have tolerated the exercise well and her therapist noted that her physical therapy regimen should gradually be increased in repetitions or resistance (Exhibit 19F, p. 22).

When the Social Security Administration addressed the reported "improvement" at the initial determination level (Exhibit 1B, p. 1), [Plaintiff] wrote that she was told "the insurance won't continue to cover the therapy unless there is "improvement" (Exhibit 4E, p. 9). This also reduces [Plaintiff's] credibility. On the one hand, [Plaintiff] exaggerated her progress to the medical insurance company, or, she is being less than candid in connection with the present claim.

(A.R. 26-27.)

In rendering a credibility determination, the ALJ is entitled to, and did, cite significant inconsistencies in Plaintiff's allegations, statements, and testimony that undermined her claimed symptoms and limitations.[7] See Benton v. Barnhart, 331 F.3d 1030, 1040 (9th Cir.

_____

[7]     In light of the ALJ's lengthy credibility finding which includes the above-quoted discussion regarding Plaintiff's inconsistent statements, Plaintiff's argument -- that the ALJ improperly rejected her claimed limitations and symptoms on the grounds that her claimed limitations and symptoms were not supported by objective evidence -- is unavailing.  (See Joint Stip. at 16-18.)

2003)(ALJ may reject a claimant's testimony upon: "(1) finding evidence of malingering, or (2) expressing clear and convincing reasons for doing so"); *see also* <u>Light v. Social Security Admin.</u>, 119 F.3d 789, 792 (9th Cir. 1997)(internal conflicts in claimant's statements are a proper basis for discrediting allegations regarding limitations).

As detailed above, the ALJ adequately demonstrated that Plaintiff made significant inconsistent statements regarding the improvement in her condition since her 1995 alleged onset date and prior to her September 1998 accident.  Certainly, Plaintiff's testimony at the hearing, both in response to the ALJ's and her counsel's questions, indicated that her condition had improved by September 1998, although it is not clear to what extent it had improved.  (A.R. 63 -- Plaintiff's response to the ALJ's question that she was "showing improvement" after September 1998 and had improved before her accident in 1998, at which time she was in better condition than she is now; 67 -- Plaintiff's response to her attorney's question that before her September 1998 automobile accident, she was "getting better [and] could see improvement.")  In addition, the physical therapy notes show "improvement," but do not specifically set forth what such "improvement" entailed.  (*See* A.R. 244-47, 470-511, 517-31, 221-38, 395-414.)

Moreover, in response to the Commissioner's May 24, 1999 letter denying benefits on the grounds that her physical therapy showed "satisfactory results," Plaintiff argued in an attachment to her July 28, 1999 Reconsideration Disability Report that she withheld reports from Dr. Watkins (or conspired with her physical therapist to withhold such reports), and indicated that the "improvement" or "satisfactory results"

noted in physical therapy reports was a way to continue receiving insurance coverage. (*See* A.R. 193 -- Plaintiff's statement that her "physical therapist did not 'show evidence' of any report to Dr. Watkins because I was told 'the insurance won't continue to cover your therapy unless there is improvement.'") This suggests, as the ALJ found, that she either lied about her "improvement" in her symptoms to her insurance carrier, or has lied in connection with her present claim that she has had no significant improvement in her disabling symptoms since her August 1995 accident. This suggests that Plaintiff may be malingering. *See also* Black's Law Dictionary (8th ed. 2004)("malinger" is defined as "[t]o feign illness or disability, [especially] in an attempt to avoid an obligation or to continue receiving disability benefits."). Thus, the ALJ's credibility rejection was proper.

However, to the extent that the clarification and development of the record on remand directed above (*viz.*, pertaining to Plaintiff's physical limitations arising from her lumbar condition, diverticulitis, and mental impairment) could shed more light on Plaintiff's claimed limitations, the ALJ nonetheless should consider any further limitations that Plaintiff may have on her residual functional capacity as evidenced by this additional information, regardless of her lack of credibility.

## 2. **The ALJ's Rejection Of The Testimony Provided By Plaintiff's Friend**

"Lay testimony as to a claimant's *symptoms* is competent evidence that an ALJ *must* take into account, unless he or she expressly determines to disregard such testimony and *gives reasons germane to each witness for*

*doing so.*" <u>Lewis</u>, 236 F.3d at 511 (emphasis added).  *See also* <u>Nguyen v.</u>
<u>Chater</u>, 100 F.3d 1462, 1467 (9th Cir. 1996); <u>Dodrill</u>, 12 F.3d at 919.
An ALJ may "properly discount lay testimony that conflict[s] with the
available medical evidence" (<u>Vincent v. Heckler</u>, 739 F.2d 1393, 1395 (9th
Cir. 1984)), particularly, where, as in <u>Vincent</u>, "lay witnesses [are]
making medical *diagnoses*," as "[s]uch medical diagnoses are beyond the
competence of lay witnesses and therefore do not constitute competent
evidence." <u>Nguyen</u>, 100 F.3d at 1467 (original emphasis).  When, however,
a lay witness testifies about a claimant's *symptoms*, which may affect the
claimant's ability to work, such testimony *is* competent evidence and
therefore *cannot* be disregarded without comment.  *Id*.

In <u>Dodrill</u>, the Ninth Circuit explained the importance of lay
testimony and why it must be considered in determining a claimant's
disability:

> Although eyewitnesses have to rely to some extent on
> communications with the claimant in ascertaining whether she
> is disabled or malingering, we have held that friends and
> family members in a position to observe a claimant's symptoms
> and daily activities are competent to testify as to her
> condition. *Sprague v. Bowen*, 812 F.2d 1226, 1232 (9th Cir.
> 1987). "Disregard of this evidence violates the Secretary's
> regulation that he will consider observations by non-medical
> sources as to how an impairment affects a claimant's ability
> to work." 20 C.F.R. § 404.1513(e)(2).

That the ALJ dismissed all the lay witness testimony

solely because he found that the claimant was not credible
suggests he may have been under the mistaken impression that
lay witnesses can never make independent observations of the
claimant's pain and other symptoms. . . . [That] is not the
case.   An eyewitness can often tell whether someone is
suffering or merely malingering.   While this is particularly
true of witnesses who view the claimant on a daily basis, the
testimony of those who see the claimant less often still
carries some weight.

12 F.3d at 919.

In evaluating the testimony provided by Ms. Samson, Plaintiff's
friend, the ALJ explained:

Ms. [Linda Sansom], a friend of [Plaintiff], also testified at
the hearing. [Ms. Sansom] testified that she sees [Plaintiff]
about once a month and talks to her on the telephone
approximately once a week.   The witness testified that
[Plaintiff] complains that she is in pain all the time and
that she has difficulty doing things she used to do. [Ms.
Sansom] testified that [Plaintiff] has problems with her hands
which cause her to drop and spill things. [Ms. Sansom] also
testified that [Plaintiff] is not "happy and sunny" like she
used to be.   As with the testimony of [Plaintiff], the
witness' testimony mostly refers to [Plaintiff's] current
medical condition, not her condition during the time period in
question.

1    (A.R. 26.)

2

3        The ALJ's rejection of the testimony of Plaintiff's friend, Ms.

4    Sansom, was not based on sufficiently specific and germane reasons.  In

5    particular, the ALJ rejected her testimony because it described

6    Plaintiff's "current" limitations, not limitations during her claimed

7    period of disability.  However, a review of the October 11, 2000 hearing

8    transcript shows that the ALJ did not question Ms. Sansom about

9    Plaintiff's symptoms during this period, and only questioned her about

10   what symptoms Plaintiff was experiencing at the present time.

11   Specifically, the ALJ asked Ms. Sansom, "*Looking at the period before*

12   *that accident [in August 1995] and comparing it with* _*today*_, have you

13   noticed any changes in [Plaintiff's] behavior?"  (A.R. 78; emphasis

14   added.)  With respect to her claimed mental symptoms, the ALJ asked,

15   "Have you noticed any change in her emotional behavior from *before 1995*

16   *to compared to the* _*present*_?"  (A.R. 79; emphasis added.)

17

18       If the ALJ wanted to find out from Ms. Sansom precisely what

19   symptoms and limitations Plaintiff exhibited following her claimed onset

20   date of August 10, 1995, to her last insured date of September 30, 1998,

21   he should have asked specific questions designed to elicit this

22   testimony, before rejecting Ms. Sansom's testimony on such grounds.

23   Thus, on remand, the ALJ should further question Ms. Sansom about

24   Plaintiff's physical and mental limitations during the period following

25   her August 1995 accident through her September 1998 last insured date.

26

27       Accordingly, on remand, the ALJ's credibility finding regarding

28   Plaintiff's claimed symptoms and limitations is affirmed, but the ALJ

must elicit further testimony from Ms. Sansom regarding Plaintiff's limitations *during the relevant time frame*, and provide specific and germane reasons, if they exist, for rejecting her testimony in accordance with the governing legal standards.

**C.    Further Testimony From A Vocational Expert May Be Necessary On Remand.**

Because the findings regarding Plaintiff's physical and mental limitations must be reevaluated on remand, Plaintiff's ultimate residual functional capacity assessment may change.   An ALJ must seek the testimony of a vocational expert if the claimant has non-exertional limitations, such as a mental impairment. *See* Reddick, 157 F.3d at 729 (because the claimant had non-exertional limitations, it was error not to seek the testimony of a vocational expert).   If the vocational expert's testimony is not based on a claimant's complete set of limitations, then it has no evidentiary value. *See* Embrey v. Bowen, 849 F.2d 418, 422-24 (9th Cir. 1987)(in posing a hypothetical to a vocational expert, the ALJ must fully and accurately reflect all of the claimant's limitations).   Therefore, the Court does not reach the issues raised by Plaintiff regarding the propriety of the vocational expert's testimony that she can perform her past relevant work, as the finding regarding Plaintiff's residual functional capacity must be reassessed and additional testimony from a vocational expert likely will be required.

///

///

///

1    **D.**    <u>**Remand Is Required**</u>**.**

2

3         Here, remand is appropriate to allow the ALJ the opportunity to

4    correct the above errors.  *See* <u>McAllister</u>, 888 F.2d at 603 (remand

5    appropriate to remedy defects in the record).

6

7                                    **CONCLUSION**

8

9         Accordingly, for the reasons stated above, the denial of benefits

10   is REVERSED, and this case is REMANDED for further proceedings

11   consistent with this Memorandum Opinion and Order.  Judgment shall be

12   entered reversing the decision of the Commissioner, and remanding the

13   matter for further administrative action consistent with this Memorandum

14   Opinion and Order.

15

16        IT IS FURTHER ORDERED that the Clerk of the Court shall serve

17   copies of this Memorandum Opinion and Order and the Judgment on counsel

18   for Plaintiff and for Defendant.

19

20        **LET JUDGMENT BE ENTERED ACCORDINGLY.**

21

22   DATED: April 12, 2006

23                                    _____
                                                  /s/
24                                         MARGARET A. NAGLE
                                      UNITED STATES MAGISTRATE JUDGE

25

26

27

28

                                         30